KEITH CHURN,                        )
                                   )
      Movant,                )
                                   )
v.                                 )        No. 3:17-cv-00149
                                   )        Judge Trauger
                                   )
UNITED STATES OF AMERICA,           )
                                   )
      Respondent.            )

## MEMORANDUM

The movant, Keith Churn, filed this *pro se* action under 28 U.S.C. § 2255, seeking to vacate, set aside, or correct his conviction and sentence for bank fraud in violation of 18 U.S.C. § 1344. (Docket Entry Nos. 1, 6.)

## I. PROCEDURAL AND FACTUAL BACKGROUND

On May 5, 2010, a federal grand jury indicted the movant in a thirteen-count indictment for bank fraud under 18 U.S.C. § 1344. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 1.) Each count corresponded to a particular bank draw. *Id.* The government voluntarily dismissed Counts One and Four at trial. *Id.*, Docket Entry No. 81, at 234. On December 6, 2013, the jury convicted the movant on Counts Three, Seven, Eight, Nine, Ten, Eleven, and Twelve and acquitted him on Counts Two, Five, Six, and Thirteen. *Id.*, Docket Entry Nos. 63, 65-68. The court sentenced the movant to 33 months of imprisonment and five years of supervised release. *Id.*, Docket Entry No. 112, at 12.

The movant timely appealed his convictions. *Id.*, Docket Entry No. 94. The facts underlying the movant's convictions were stated by the Sixth Circuit as follows:

In December 2013, defendant Keith Churn was found guilty of seven counts of bank fraud stemming from two schemes in which he received bank loans ostensibly to construct houses, but performed little to no work.

. . . .

## A. Churn Proposes Two Projects.

Defendant Keith Churn owned C & M Construction Management, a Tennessee construction company specializing in remodeling and rehabilitation, since the late 1990s. Around October 2006, Churn entered a business agreement with Dustin Rief, under which Rief would purchase real property at 2408 Clarksville Pike, Nashville, Tennessee, and Churn would install a modular—or prefabricated—house on the property. Churn would pay Rief rent during the six-to-eight months of construction and would purchase the property from him upon completion. For his efforts, Rief would receive $5,000 initially and an additional $5,000 after Churn's purchase, for a total of $10,000.

Rief financed the purchase and construction of the Clarksville Pike property with a $187,800 construction loan from BancorpSouth Bank ("BSB"). Under the terms of the loan agreement, a portion of the loan would be distributed upfront to purchase the property, and the remaining funds would be distributed in stages to pay for construction. BSB disbursed $66,758.19 for the purchase, leaving $121,041.81 for construction.

The same year, Churn proposed a similar investment to Milton Thomas. Thomas agreed to obtain financing to purchase 956 Green Street, Franklin, Tennessee, and Churn agreed to demolish the existing house and install a modular home. The two would split any profits. To finance the project, Thomas received a $226,500 loan from BSB, $77,976.83 of which was distributed to fund the property purchase.

BSB distributed the portion of the loan for construction in "draws." For each draw, the bank would transfer money from the loan to Rief's and Thomas's checking accounts, which they could then use to pay contractors. Before approving a draw, the bank might send an inspector to the property, or it might review contractors' receipts, to ensure that the claimed work was actually being performed.

There were four draws made for the Clarksville Pike property: $25,000 on October 31, 2006; $15,000 on December 18, 2006; $30,000 on January 10, 2007, and $4,500 on January 12, 2007. On December 5, 2006, Churn submitted an invoice for $17,733 to BSB for permit fees, disconnecting old utilities, grading, and preparing footings and foundations. Based on the invoice, BSB approved a $15,000 draw on December 18.

On December 22, 2006, Churn submitted a specification sheet and an invoice to BSB, which purportedly showed an order for a modular house from All American Homes of N.C., LLC ("AAH"). The invoice charged a down payment of $33,462, or approximately one-third of the total cost of the modular house. Two weeks later, Churn informed a BSB loan officer, Lisa Campsey, that the house would be set on February 8, 2007. Campsey later approved draws of $30,000 and $4,500. During this period, a site inspector for BSB submitted periodic reports to BSB indicating that demolition of the existing structure had occurred and the lot was cleared.

There were four draws on the loan for the Green Street property: $20,000 on December 15, 2006; $8,000 on January 10, 2007; $12,000 on January 18, 2007; $22,000 on January 23, 2007; and $668.91 on February 1, 2007. On January 17, 2007, Churn submitted a specification sheet and an invoice to BSB, which purportedly showed an order for a modular house from AAH. Like the invoice for the Clarksville Pike property, the invoice charged a down payment of approximately one-third of the total cost of the modular house, or $33,638. Based on the invoice, BSB approved draws of $12,000 and $22,000.

## B. Questions Arise About the Projects.

At some point, Campsey grew suspicious about the progress of the projects. For the Clarksville Pike property, although some demolition had been done, Campsey learned that the tasks listed on the December 5, 2006, invoice were not actually completed, including "pulling" the construction permit. Nor was the modular house set on February 8 as Churn said it would be. Similarly, she visited the Green Street property, but found no completed work.

An inspector dispatched by BSB made similar observations. On his first visit to the Clarksville Pike property in October 2006, he noted that the existing structure had been torn down and cleared. But a few months later, on March 23, 2007, the inspector estimated that only 1.2 percent of the construction project had been completed. He later found that no additional work was performed from then through July 17. The inspector also assessed the Green Street property on March 16 and determined that only 1.2 percent of the construction project had been completed; when he returned on July 17, he found that no work had been done since his March 16 visit.

Questions about Churn's invoices arose as well. The invoices he submitted to BSB to support draw requests purportedly reflected purchases for two "Hot Tamale"-style modular houses. But AAH never received any orders or payments from Churn. AAH also did not prepare the invoices Churn submitted to BSB. While the submitted invoices reflected a one-third deposit on the total purchases, as well as costs associated with installing electrical and plumbing "tie-ins," AAH never required

3

more than a 10-percent deposit, the industry standard. Indeed, AAH was not even able or licensed to provide electrical or plumbing services.

On March 3, 2007, Campsey emailed Churn, stating that an AAH representative told her that it had not received funds from Churn and would not start construction on modular homes until it received the money. She stated that Churn's representations to BSB that he had paid deposits on the houses using the loans "greatly conflicts" with information given by AAH. Since Churn had previously said that he would pay for the purchases through checks, Campsey requested copies of cancelled checks and further information about what charges Churn had paid, but she never received any. She also pointed out to Churn that there was no pad (a part of the foundation) laid on the Green Street property even though Churn told her that it was already installed.

Two days later, Churn told Campsey that she would "have the information that's needed by the end of the business day." Churn also said that BSB's inspector should "go by [the] site at [the] end of this week" and that Churn "will also have in writing this week [a] guarantee from [the] manuf[acturer] that we will have product this month on the sites." (*Id*.) Campsey replied by confirming an inspection date, requesting proof of payment, and asking for a written guarantee from the manufacturer. She never received any of the items. When Campsey later went to the Green Street property, she observed that "nothing had been done since the first time. It was the same every single time...." (Trial Tr., R. 80, PageID 296.)

Campsey later called Churn. He said that the houses were coming, but from IBC instead, a different manufacturer. Churn promised to perform additional work on the properties, but Campsey said that she no longer trusted him.

On March 8, 2007, Churn told Campsey that he "will be moving forward with the work on the projects" and that she was "very wrong about [her] comments." Churn said that he would provide "[a]ll info" to Rief and Thomas, who would "deal with [her] directly." (*Id*.) Campsey, who had been in contact with Rief and Thomas throughout the projects, still never received any documentation.

In early May 2007, BSB sent formal demand letters to Rief and Thomas, requesting written confirmation that modular houses were being completed and verification of the delivery dates. The letters warned that failure to provide the requested documentation or to complete the site and foundation work by May 18, 2007, would result in the loans being payable immediately.

On May 18, Churn sent an email with two attachments to BSB. The first attachment was an invoice from "C & M Construction Managment" [sic] to Rief, stating that the "deposite [sic] has been paid for unit ordered for 2408 [Clarksville Pike] job site," and confirming a $33,463 payment. The second attachment was a photo of modular

houses sitting on trailers. Churn told Campsey that the structures depicted would be delivered to the Clarksville Pike property.

Campsey quickly responded that "this information is not sufficient." She again demanded written confirmation from AAH verifying production of the units and the dates of delivery, site preparation, and foundation work.

Churn responded five days later, on May 23, stating that the units were not from AAH, but that BSB would be getting paperwork from C & M Construction Management directly. BSB never received any paperwork. During its investigation, BSB located the modular houses shown in the photographs. After examining the houses' serial numbers, the bank learned that they were owned by other people, not Churn.

Churn stopped making monthly payments on the loans sometime in April 2007. While Rief attempted to make some payments himself, he was ultimately unable to continue paying, leading to the foreclosure of the Clarksville Pike property and Rief's filing for personal bankruptcy. Thomas also attempted to make some payments himself, but was unable to do so after he lost his job; BSB foreclosed the Green Street property and Thomas also filed for personal bankruptcy.

**C. Churn's Explanation.**

Churn had a different understanding of events. According to him, he did place orders with AAH, but sometime in mid-February to mid-March, it placed his orders on hold "because of a lot of confusion that they said they were having from the bank." (Trial Tr., R. 82, PageID 629–30.) Churn attempted to contact other manufacturers to provide him with modular houses, but was unable to locate any that would sell him units at a comparable cost. Later, he found some modular houses at a defunct AAH plant; the houses were initially purchased by a nonprofit that eventually had no use for them after a failed land deal. These, Churn claims, were the units in the photograph he sent to BSB: Churn speculates that the bank was confused because the units were associated with what were likely the names of the original buyers and not his.

Churn placed these newfound units "under contract" and met with Chris Marketti of BSB to discuss a deal. (Trial Tr., R. 82, PageID 632.) Churn purportedly detailed a breakdown of expenses for the Clarksville Pike property and tried to negotiate with BSB to pay him, but only after delivery of the unit. BSB, however, "never followed up." (Trial Tr., R. 82, PageID 667.) Had the bank not ceased working with him, Churn believed that he could have completed the deals.

D. Churn Is Indicted.

. . . . The Clarksville Pike property is the subject of Counts 1, 2, 3, 7, 8, 9, and 13 in the indictment; the Green Street property is the subject of Counts 4, 5, 6, 10, 11, and 12 in the indictment. . . .

*Churn v. United States*, 800 F.3d 768, 771-74 (6th Cir. 2015).

On September 10, 2015, the Sixth Circuit denied the movant's appeal and affirmed his convictions. *Id.* at 771. The movant's petition for rehearing was denied on October 23, 2015. *Id.* at 768.

On January 20, 2017, the movant filed his Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence. (Civil Case No. 3:17-cv-00149, Docket Entry No. 1.) On April 10, 2017, the movant filed an Amended Motion To Vacate, Set Aside, Or Correct Sentence (Docket Entry No. 6), to which the respondent filed a response (Docket Entry No. 11), such as it is, and the movant filed a "Motion to Vacate conviction or Motion for Evidentiary Hearing" (Docket Entry No. 13) and a Reply (Docket Entry No. 14).

## II. THE INSTANT MOTION[1]

Pursuant to 28 U.S.C. § 2242, a federal habeas petition may be amended according to the requirements set forth in Federal Rule of Civil Procedure 15. *See Oleson v. United States*, 27 F.

---

[1]The movant's address reflects that he has been released from prison. However, the movant received five years of supervised release and is still serving that sentence. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 112, at 12.) Thus, the court has jurisdiction over this action, as the movant is "in custody" for purposes of considering his § 2255 motion. *See United States v. Sandles*, 469 F.3d 508, 517-18 (6th Cir. 2006) ("Because Sandles was still serving his sentence on supervised release at the time that he filed his petition, he could only challenge the validity of his conviction by means of a motion to vacate his sentence under 28 U.S.C. § 2255."); *United States v. Sferrazza*, 645 F. App'x 399, 405 (6th Cir. 2016) (recognizing that a defendant completing her supervised release was "in custody" and therefore the writ of *coram nobis* was not available to her); *United States v. Francis*, No. 5:04-CR-74-KSF, 2010 WL 6428639, at *3 (E.D. Ky. Dec. 30, 2010), *report and recommendation adopted*, No. 5:04-CR-74-KSF, 2011 WL 1303275 (E.D. Ky. Apr. 1, 2011) (a pending term of supervised release meets the "in custody" requirement for pursuing § 2255 relief).

App'x 566, 568-570 (6th Cir. 2001) (stating that the mandate of Fed. R. Civ. P. 15(a), that a court freely grant leave to amend when justice so requires, has been interpreted to allow supplementation and clarification of claims initially raised in a timely § 2255 motion). However, "[a]ny attempt to raise a new claim for relief in a Rule 15 motion to amend pleadings is subject to AEDPA's one-year statute of limitations." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008). Thus, "a Rule 15 motion will be denied where it is filed after that period expires unless the proposed amendment relates back to the date of the original pleading within the meaning of Rule 15(c)[(1)]." *Id*. at 475-76. "Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings 'arose out of the conduct, transaction, or occurrence set out . . . in the original pleading.'" *United States v. Clark*, 637 F. App'x 206, 209 (6th Cir.), *cert. denied*, 136 S. Ct. 2032, 195 L. Ed. 2d 234 (2016) (quoting Fed. R. Civ. P. 15(c)(1)(B)).

In *Mayle v. Felix*, 545 U.S. 644 (2005), the Supreme Court stated that "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id*. at 650. The Supreme Court explained that, "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Id*. at 662. Therefore, "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Id*. at 664. Here, the two motions are virtually the same, as the movant does not assert any new claims in his amended motion, and thus, the amended motion relates back to the date of the original pleading.

The movant contends, in sum, that he was denied effective assistance of counsel by (1) counsel's failure "to investigate and present the permits for the construction on the properties, bank statements and cancelled checks to show the money spent on the two projects;" (2) counsel's failure "to have Bob Nordass, All American Homes (AAH) sale person, testify that Mr. Churn had ordered and placed a down payment on the modular houses;" and (3) counsel's failure "to have the accountant, Christopher M. Lovin, testify as to the bank statements regarding the payments to the contractors, investors (Milton Thomas and Dustin Rief), AAH and others." (Docket Entry No. 6, at 5.) In response, the respondent contends that the movant's ineffective assistance of counsel claims (1) are procedurally barred; (2) are time-barred by the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations; and (3) fail on the merits. (Docket Entry No. 11, at 7.)

Having carefully considered the record, the court concludes that an evidentiary hearing is not needed. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the movant is not entitled to relief). Consequently, the court shall dispose of the § 2255 motion as the law and justice require. Rule 8(a), Rules– § 2255 Cases.

## III. ANALYSIS OF THE CLAIMS

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such sentence, that the sentence was in excess of the maximum authorized by law, or that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail on a § 2255 motion, a movant "must demonstrate the existence of an error of constitutional magnitude

which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)). Non-constitutional errors are generally outside the scope of § 2255 relief. *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000). A movant can prevail on a § 2255 motion alleging non-constitutional error only by establishing a "fundamental defect which inherently results in a complete miscarriage of justice, or an error so egregious that it amounts to a violation of due process." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (internal quotation marks and additional citation omitted)).

### A. Procedural Default

The respondent argues that, because the movant did not raise his ineffective assistance of counsel claims on direct appeal, these claims are procedurally defaulted. (Docket Entry No. 11, at 8.) A § 2255 motion is not a substitute for a direct appeal. Consequently, as a general rule, any claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the movant shows "(1) 'cause' excusing [the] procedural default, and (2) 'actual prejudice' resulting from the errors," *United States v. Frady*, 456 U.S. 152, 168 (1982), or demonstrates that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted). However, a claim of ineffective assistance of counsel is not subject to the procedural-default rule. *Massaro v. United States*, 538 U.S. 500, 504 (2003). An ineffective-assistance of counsel claim may be raised in a collateral proceeding under § 2255, regardless of whether the movant could have raised the claim on direct appeal. *Id*. Accordingly, the respondent's contention is without merit.

## B. Statute of Limitations

Next, the respondent argues that the movant's claims are time-barred under the AEDPA because he filed his motion more than a year after his conviction became final. (Docket Entry No. 11, at 9.) Section 2255 has a one-year limitations period that commences from the latest of

> (1) the date on which the judgment of conviction becomes final;

> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f)(1)-(4).

Here, subsection (f)(1) applies to the movant's ineffective assistance of counsel claims, and the limitations period ran from the date the judgment of conviction became final. Generally, a conviction becomes final upon the conclusion of direct review. *Sanchez-Castellano v. United States*, 358 F.3d 424, 426 (6th Cir. 2004). "Finality attaches when [the Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). Thus, when a federal criminal defendant appeals to the court of appeals, the "judgment of conviction becomes final for § 2255 purposes upon the expiration of the 90-day period in which the defendant could have petitioned for certiorari to the Supreme Court, even when no certiorari petition has been filed." *Sanchez-Castellano*, 358 F.3d at 426-27 (citing *Clay*, 537 U.S. at 532); Sup. Ct. R. 13.1 ("[A]

petition for a writ of certiorari to review a judgment in any case, civil or criminal, . . . . is timely when it is filed with the Clerk of [the Supreme] Court within 90 days after entry of the judgment.").

Here, the deadline for filing a petition for writ of certiorari with the Supreme Court expired on January 21, 2016, ninety days after the Sixth Circuit denied the movant's petition for rehearing on October 23, 2015. *See* Sup. Ct. R. 13.3 ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment . . . and not from the issuance date of the mandate . . . . But if a petition for rehearing is timely filed . . . the time to file a petition for a writ of certiorari . . . runs from the date of the denial of rehearing . . . ."). As noted above, the movant filed his motion in this action on January 20, 2017, which is within the one-year statute of limitations period. Accordingly, this action is timely, and the respondent's contention is without merit.

### C. Merits

To establish ineffective assistance of counsel, the movant must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the movant fails to make either of these showings, the ineffectiveness claim is defeated. *Id*. at 700. In *Strickland*, the Supreme Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance . . . [, as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id*. at 689. To avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id*. (citation omitted).

To establish that counsel's performance was deficient under *Strickland*, a movant "must identify acts that were 'outside the wide range of professionally competent assistance.'" *Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 690). In evaluating whether a movant has received counsel that falls short of what the Sixth Amendment guarantees to a defendant, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

In evaluating the prejudice prong, courts must be mindful that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id*. (citation omitted). Rather, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (quoting *Strickland*, 466 U.S. at 694).

The movant argues that he was denied effective assistance of counsel by counsel's failure "to investigate and present the permits for the construction on the properties, bank statements and cancelled checks to show the money spent on the two projects." (Docket Entry No. 6, at 5.) The movant asserts that at trial he testified as to the existence of these documents but was unable to produce them when requested to do so by the government. *Id*. The movant also argues that his trial

counsel failed "to have Bob Nordass, All American Homes (AAH) sale person, testify that Mr. Churn had ordered and placed a down payment on the modular houses" and "to have the accountant, Christopher M. Lovin, testify as to the bank statements regarding the payments to the contractors, investors (Milton Thomas and Dustin Rief), AAH and others." *Id.*

In response, the respondent argues that:

> even if Churn had presented evidence at trial of "permits for the construction on the properties, bank statements and cancelled checks to show the money spent on the two projects" or had "Christopher M. Lovin testify as to the bank statements regarding the payments to the contractors, investors, AAH, and others," such evidence would not have negated evidence of his guilt. See (Crim. DE# 8, Affidavit). It is undisputed that AAH also did not prepare the invoices Churn submitted to BSB. The fraudulent invoice reflected a one-third deposit on the total purchases, as well as costs associated with installing electrical and plumbing "tie-ins." The Sixth Circuit noted, "AAH was not even able or licensed to provide electrical or plumbing services." *Churn*, 800 F.3d at 773. Churn also claims that failing to have Bob Nordass from AAH testify was ineffective. However, it is uncontroverted that AAH never received the "one-third deposit" listed in the fraudulent invoice Churn submitted to BSB. Churn's counsel correctly concluded that Nordass' testimony "would not help" Churn's case. (Crim. DE# 8, Affidavit.)

(Docket Entry No. 11, at 9.)

In reply, the movant asserts that his counsel's failure "to present the permits" allowed Campsey to falsely testify that no permits were pulled and that his counsel's "failure to present the bank statements and cancelled checks left [] Campsey's unreliable testimony regarding the funds from the construction loan unchallenged." (Docket Entry No. 14, at 2.) The movant also asserts that "Nordass would have given an accurate account of what transpired between AAH" and the movant. *Id.* In his "Motion to Vacate conviction or Motion for Evidentiary Hearing," the movant further asserts:

> Mr. Sayers admits that AAH sometimes sends out blank order forms (Government's Exhibit 13) for builders to fill out. (Crim-Doc.81, pgs 166,180-182) Mr. Sayers also stated that it was the job of the contractor/builder to produce its own invoice using

AAH template by plugging in their numbers. (Id. Pgs 165-166,180-181) Mr. Churn was allowed to include the cost of the electric tie-in, plumbing tie-in and other things on the order form. (Id. )

In 2004 or 2005, after AAH shut down their plant in Springfield, Tennessee, they "weren't licensed" to sell modular homes "directly to retail customers" in Tennessee. (Crim-Doc. Pgs 158-160) However, AAH continued to sell modular homes until 2009 out of their North Carolina plant through builders, who were licensed modular building unit dealers in Tennessee. (Id.) Mr. Churn was a licensed modular building unit dealer from October 26, 2006 through June 30, 2007. (Civ-Doc.8, Attachment 4) (Crim-Doc.81, pgs 179-180)

Mr. Sayers admits that after the Springfield plant was closed, there were "open units" left on their lot which "[ Mr. Churn] could have bought." (Id. Pgs 184-186) These open units were originally ordered by other customers who failed to pay for them. (Id.) This explains why Mr. Churn's name did not appear on modular homes.

Based on the foregoing, had [the movant's counsel] presented the permits, bank statements, cancelled checks, Mr. Nordass and Mr. Lovin's testimony, they would have raised a reasonable doubt in the jury's mind.

(Docket Entry No. 13, at 2; Docket Entry No. 14, at 2.)

As to the movant's contention that his counsel was ineffective for failing to present the permits for the construction on the properties, the bank statements, and the canceled checks to show that the money was spent on the two projects, the movant contends:

The documents would have disproved the government's claim that: (1) Mr. Churn did not pull all the necessary permits; (2) and that Mr. Churn did not use the funds toward the construction and the purchase of the modular homes. In fact, the bank statements show the payments to the sub-contractors, investors (Mr. Thomas and Mr. Rief) and down-payment for the modular homes.

(Docket Entry No. 6, at 5.) In support of his contention, the movant submits copies of various canceled checks, bank statements and a construction demolition permit. *Id*. at 7-48. However, these documents fail to show that their lack of presentment at trial prejudiced the movant.

As to the demolition permit, there is no dispute that the existing structures on the Clarksville Pike and Green Street properties were demolished. Lisa Campsey, BSB's loan officer, Dustin Rief

and Jerry Lillard, BSB's site inspector, testified that the existing structures on the Clarksville Pike and Green Street properties were demolished and removed. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 80, at 64-65, 114; Docket Entry No. 81, at 92-93, 200-01, 204, 215-17, 219.) However, at trial, the government asked the movant if he obtained new *construction* permits, not demolition permits. *Id*., Docket Entry No. 82, at 91-92. Earlier Campsey testified that the movant had submitted an invoice for the Clarksville Pike property that covered the fee for new construction permits, among other things. *Id*., Docket Entry No. 80, at 63. Campsey testified that, "through verification with the county, the permit was never pulled." *Id*. at 64. As to this invoice, the movant testified as follows:

> Q. And you see the top line there in the middle section, it says, fees for new construct perm; is that right?
>
> A. Yes.
>
> Q. Am I correct that that means fees for new construction permits?
>
> A. Yes, for demo fees, stuff like that, yes. Because it starts with demo permits, and then it graduates into the other permits.
>
> Q. So is it your testimony that when you say new construction permits, you mean demolition permits?
>
> A. Right.
>
> Q. And you submitted this to BancorpSouth; is that right?
>
> A. Yes.
>
> Q. And did you think when you said the words new construction permits they would think you meant demolition permits?
>
> A. I don't even remember getting that in-depth on it, no.
>
> Q. Did you ever obtain new construction permits? Permits to construct something on these sites?

A. Yes, yes. We got -- at Green Street, we had to go through a little bit different process. They would only allow us to do the demo permit and then come back in with our final plans to get the other permit. On 2408, we did both. I went down and did both.

Q. Did you provide copies of these permits to BancorpSouth back in 2007?

A. I don't recall. I can't remember.

Q. Do you have copies of these permits now?

A. No. I don't think we do, no.

*Id.*, Docket Entry No. 82, at 91-92.

Here, the movant has only submitted a copy of a demolition permit for the Clarksville Pike property, not a construction permit. (Civil Case No. 3:17-cv-00149, Docket Entry No. 6, at 41-42.) Such evidence is immaterial as to showing ineffective assistance of counsel, as the government asked the movant for a construction permit, not a demolition permit. Moreover, Campsey testified that a typical first draw on a construction loan would be for "demolition permits. Then the actual clearing of the lot, grading of the lot, your permits for the building that you are going to be placing on that. And then possibly even your pads, foundations, things of that nature." (Criminal Case No. 3:10-cr-00116, Docket Entry No. 80, at 51-52.) Campsey testified that $25,000 was disbursed on the first loan draw on October 31, 2006, that was charged in Count Two of the indictment, on which the movant was acquitted. *Id.* at 52. The evidence showed that the existing structure on the lot was demolished and removed. Similarly, with respect to the Green Street property, Campsey testified that the first draw was in December 2006 for $20,000, which was charged in Count Six, on which the movant was also acquitted. *Id*. at 54-56. The evidence showed that the existing structure on the lot was demolished and removed. Thus, the movant fails to show that he was prejudiced by not having copies of the demolition permits at trial.

As to the submitted copies of the bank statements and the canceled checks, the movant fails to articulate how these documents are relevant or how Lovin's potential testimony regarding these documents would have been helpful at trial. In his affidavit, the movant states:

> 14.    Mr. Lovin's bank statements listing, cancelled checks and other Wachovia bank's documents show that from October 2006 through July 2007, I used the disbursed funds toward the two projects and made payments to: Mr. Milton Thomas ($21,829 ), Mr. Dustin Rief ( $12,871), Shy Dueax ($8000), David Lutz ($1,300), Desk & Chairs & Things ($450), Handyman Connection ($1700), S & S Contracting ($4900), C & W Construction ($2035), Horace Inc. Construction ($1100), Alex Mitchell ($5940), RDI (office rental $8000), James Jackson (salary $32,000), Department of Commerce and Insurance ($4450 for Surety Bond and Modular Home dealer license), All American Homes ($2,000 deposit for both modular homes) and BancorpSouth ($900 interest on each properties and $100 insurance monthly).[2]
>
> 15.    Mr. Lovin was willing to explain the Vendor Summary, Bank statement, Cash Transfer, Unknown Expense and Unknown Deposit list in more detail, which account for all the funds spent on the two projects.

(Civil Case No. 3:17-cv-00149, Docket Entry No. 8, at ¶¶ 14-15.)

However, the copies of these documents simply do not show that the loan funds were solely used for purposes of facilitating the building of the Clarksville Pike and Green Street projects. The movant's checks to Shy Dueax, Desk & Chairs & Things, and Handyman Connection, range from September 2006 to November 2006, a time period unrelated to the dates in the counts on which the movant was convicted. *Id.*, Docket Entry No. 6, at 21-25, 27-28. The movant testified that S & S Contracting performed the initial work on the Clarksville Pike property, demolishing and removing the existing house, clearing and grading the lot, and digging the footings. (Criminal Case No. 3:10-

---

[2]As to "Department of Commerce and Insurance ($4450 for Surety Bond and Modular Home dealer license), All American Homes ($2,000 deposit for both modular homes) and BancorpSouth ($900 interest on each properties and $100 insurance monthly)," the movant did not submit copies of canceled checks in support of these purported expenditures.

cr-00116, Docket Entry No. 82, at 49-50.) The movant testified that the Mitchell Company, owned by Alexander Mitchell, performed the initial work on the Green Street property, demolishing and removing the existing house, leveling the land, and digging the footings. *Id*. at 36, 50-51. The movant testified that the demolition and site work at the two properties each cost over $17,000. *Id*. at 51. However, the canceled checks drawn to S & S Contracting and Alex Mitchell amount only to a total of $4900 and $5940, respectively. (Civil Case No. 3:17-cv-00149, Docket Entry No. 6, at 29-30, 32-33.) The government did not dispute that there was some work done on the lots, such as demolishing of the existing structures, removing debris, grading the land and digging footings.

There was no testimony as to C & W Construction and Horace Construction performing any work for the movant. The canceled checks drawn to C & W Construction and Horace Construction amount only to a total of $2035 and $1100, respectively. *Id.* at 10, 31. The movant also did not testify as to making any payments to David Lutz. Based on documents submitted by the government at trial, David Lutz evidently performed the initial inspection of the Clarksville Pike property on July 20, 2006. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 81, at 197-98, 226-28.) The canceled check drawn to David Lutz is only in the amount of $1300. (Civil Case No. 3:17-cv-00149, Docket Entry No. 6, at 26.)

As to the payments to Milton Thomas, *id.* at 11-15, and Dustin Rief, *id.* at 16-20, one check, drawn to Thomas in the amount of $10,000, was dated November 13, 2006, which is not related to the draws during the relevant time period in the indictment, and another check, drawn to Thomas in the amount of $4,700, was dated December 29, 2006, which is described on the memo line as being a payment from the "title company." *Id.* at 11-12. The other three checks to Thomas are for $1045, $1084 and $5,000. *Id.* at 13-15. As to Rief, the movant submits one check, dated November

18

13, 2006, in the amount of $923.10, *id.* at 17, and another, dated November 10, 2006, in the amount of $5,000, *id.* at 20. Rief testified that he received $5,000 after closing on the Clarksville Pike property. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 81, at 112.) The other three checks to Rief are for $25, $5933 and $990. (Civil Case No. 3:17-cv-00149, Docket Entry No. 6, at 16, 18-19.) The movant did not testify at trial as to making any specific payments to Thomas and Rief and does not assert in his Motion to Vacate how these payments to Thomas and Rief are relevant to the funds drawn from Thomas's and Rief's construction loan accounts that the movant claims he used towards the Clarksville Pike and Green Street projects. Thus, the copies of these checks are irrelevant.

The movant submits only two checks drawn to RDI, dated September 1, 2006 and May 2, 2007, for $800 each, purportedly for office rental. *Id.* at 34-35. The movant did not submit a rental lease for the office. The movant also submits four checks drawn to James Jackson, one for $4093, and the other three for $2000 each. *Id.* at 36-39.[3] The movant testified at trial that, to become a builder/dealer for AAH, AAH required that the dealer have its own office space, be bonded and hire a "dedicated person that they would come in and train." (Criminal Case No. 3:10-cr-00116, Docket Entry No. 82, at 26-27.) The movant testified that he paid $3800 to get bonded, $800 to $900 per month to rent office space, and $1000 per week in salary to Jackson from December 2006 to July 2007. *Id.* at 27, 54. However, the movant admitted that he never told BSB that he was using the loan money to rent office space or to pay Jackson, and the invoices do not reflect these purported expenditures. *Id.* at 82-83. Neil Sayers, who at the time of the events was vice president and general

---

[3]The movant submitted copies of four checks, each in the amount of $2000, drawn to James Jackson, but one is a duplicate. *See id.* at 40.

manager of AAH, testified about the process a builder goes through in becoming a seller or installer of AAH modular houses. *Id.*, Docket Entry No. 81, at 178. Sayers stated that the builder would need to be licensed, but he made no mention of being required to rent office space and to hire a designated employee for the office. *Id.* at 178-79. Accordingly, the court concludes that these documents are not helpful to the movant.

The movant also argues that his trial counsel was ineffective for not having Bob Nordass, AAH's sales person, testify that the movant ordered and placed a down payment on the modular houses. At trial, the movant testified that he had placed the newfound units, located in Springfield, Tennessee, under contract. *Id.*, Docket Entry No. 82, at 61, 65, 67, 94. When asked if he had a copy of the contract, the movant stated that he did, but that he did not bring it with him to trial. *Id.* at 94. The movant stated that his "rep," Bob Nordass, "would know." *Id.* at 94-95. However, the movant does not include in his submissions this alleged contract, and thus, fails to show that calling Nordass would have been of any benefit to the movant at trial.

The evidence shows that, at trial, the movant admitted that the draws taken out of the account for the Clarksville Pike property totaled $74,500, but that he did not do $74,500 worth of work on that property. *Id.* at 72-73. Likewise, the movant admitted that the draws taken out of the account for the Green Street property totaled $62,000, but that he did not do $62,000 worth of work on that property. *Id.* at 73. The evidence demonstrated that, in early January, the movant told Campsey that the house would be set on the Clarksville Pike property on February 8, 2007. *Churn*, 800 F.3d at 772. The evidence showed that, on March 23, 2007, BSB's inspector estimated that 1.2 percent of the construction project on the Clarksville Pike property had been completed and that no additional work on the property was performed from that date until July 17, 2007. *Id.* The inspector also

determined on March 16, 2007 that 1.2 percent of the construction project on the Green Street property had been completed. *Id.* The inspector later determined that no additional work was performed from that date until July 17, 2007. *Id.* Further, the movant never submitted to Campsey any copies of canceled checks and other information concerning charges, as requested by Campsey. *Id.* at 773.

The evidence at trial also showed that the movant submitted specification sheets and invoices to BSB that purportedly showed orders for two "Hot Tamale"-style modular houses from AAH for the two properties. *Id.* at 772-73. "Hot Tamale" was a model only made by AAH. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 81, at 164.) The movant submitted the specification sheet and invoice on the Clarksville Pike property on December 22, 2006, and on the Green Street property on January 17, 2007. *Churn*, 800 F.3d at 772. The two invoices charged a down payment of approximately one-third of the total cost of each of the modular houses. *Id.* Based upon the invoices, BSB approved draws of $30,000 and $4,500 on the Clarksville Pike property and draws of $12,000 and $22,000 on the Green Street property. *Id.* AAH did not prepare these invoices. *Id.* The movant initially stated that the documents he provided the bank were order forms, not invoices, but when pressed on cross examination, he admitted that in his email to Campsey he represented that the documents he sent to her were invoices. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 82, at 76-78.) AAH also never received any orders or payments from the movant. *Churn*, 800 F.3d at 773.

Neil Sayers described the process by which a builder would order a modular home from AAH, stating that, after a builder submitted the model and specifications to AAH, AAH would then send a pricing to the builder. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 81, at 160-61.)

21

If the builder wanted to proceed, the builder would then send AAH $1000 to obtain a blueprint. *Id*. at 161. After receiving the blueprint, if the builder wanted to continue to proceed, the builder would submit a written confirmation with a ten percent deposit. *Id*. at 162. Sayers testified that AAH never required higher than a ten percent down payment on modular houses–the industry standard. *Id*. at 157-58, 169-70. The amount of the ten percent deposit would be generated on the last order form that AAH sent out. *Id.* at 187. AAH never received a deposit payment prior to filling out an order form and giving it to the builder. *Id*.

Sayers also testified that he was not aware of any delays in building or manufacturing houses by AAH in late 2006 or early 2007, and, when asked what would AAH have done "if a builder had placed an order with All American Homes in [late 2006, early 2007] time frame, provided the required deposit, shown they had the permits and met the other requirements," Sayers responded, "Build them a home." *Id.* at 177. Moreover, the movant's invoices included costs associated with installing electrical and plumbing "tie-ins," but AAH was not able or licensed to provide electrical or plumbing services. *Churn*, 800 F.3d at 773.

Further, the evidence showed that no pad (a part of the foundation) was ever laid on the Green Street property. (Criminal Case No. 3:10-cr-00116, Docket Entry No. 82, at 98.) In an email memorializing Campsey's and the movant's conversation, Campsey told the movant that no pad was laid on the Green Street property, even though the movant had told her that it was already installed. *Id*. at 99. The movant testified that he did not remember saying that the pad had been laid, but admitted that he made no objection to Campsey's statement in his email response to her. *Id.* at 98-100.)

Based upon the above, the movant fails to show that the submission of the various canceled checks and bank statements would have been of any benefit to him at trial and, therefore, fails to show that he suffered any prejudice by their omission. Likewise, the movant fails to present any evidence to show that the testimony of Lovin and Nordass would have been of any benefit to the movant at trial. Accordingly, the court concludes that the movant's ineffective assistance of counsel claims are without merit.

## IV. CERTIFICATE OF APPEALABILITY

When the district court denies a ground for relief on the merits in a habeas corpus action, a certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the movant has not made a substantial showing of a constitutional right as to any of his claims, a certificate of appealability will not issue with respect to any of those claims.

## V. CONCLUSION

For all of the reasons stated, the movant's Amended Motion To Vacate, Set Aside, Or Correct Sentence (Docket Entry No. 6) will be DENIED. This action will be dismissed.

An appropriate order shall enter.

_____
Aleta A. Trauger
United States District Judge